NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241156-U

NO. 4-24-1156

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| MAKENNA RHODES, | ) | No. 24CF489 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Derek G. Asbury, |
| | ) | Christopher R. Doscotch, |
| | | Judges Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court affirmed (1) the trial court's original order denying defendant pretrial release finding the State proved by clear and convincing evidence that no condition or combination of conditions could mitigate the real and present threat posed by defendant and (2) the court's order denying defendant's motion to reconsider her pretrial release because, despite any change in circumstances, there remained no condition or combination of conditions that could mitigate the real and present threat posed by defendant.

¶ 2     Defendant, Makenna Rhodes, appeals the trial court's order denying her pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See Pub. Act. 102-1104, § 70 (eff. Jan 1, 2023) (amending various provision of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (setting the Act's effective date as September 18, 2023). Defendant filed a "hybrid" motion,

seeking relief from the original detention order on two grounds: (1) the State failed to prove by clear and convincing evidence that no condition or combination of conditions could mitigate any real and present safety threat she posed and (2) a change in circumstances occurred, alleviating any danger she posed and warranting her pretrial release with conditions. After our careful review, we affirm the trial court's decisions.

¶ 3                     I. BACKGROUND

¶ 4              A. Initial Charge and Probable Cause Affidavit

¶ 5        On July 19, 2024, defendant was charged by information with one count of first degree murder. The information alleged on June 26, 2024, defendant applied pressure with a foreign object to the face of S.Z., a child under 12 years of age, knowing such act created a strong probability of death or great bodily harm to S.Z. and thereby causing the child's death. See 720 ILCS 5/9-1(a)(2) (West 2022). That same day, the State filed a verified petition to deny pretrial release, alleging defendant was charged with a detainable offense and her pretrial release posed a real and present threat to the safety of any person or the community based on the specific articulable facts of the case.

¶ 6        The affidavit of probable cause filed with the petition stated on June 26, 2024, the Pekin Police Department responded to defendant's apartment in Pekin on the report of an unresponsive 10-month-old female. Despite the rescue efforts of first responders, the child, S.Z., was pronounced deceased upon arrival at the hospital. The autopsy report described "abrasions and injury on the inside of S.Z.'s upper lip and frenulum," which, according to a pediatric child abuse physician, were "consistent with pressure being applied to S.Z.'s face." The forensic pathologist ruled out any medical cause of S.Z.'s death after toxicology and bloodwork results were analyzed and found S.Z.'s cause of death to be asphyxiation.

¶ 7 The affidavit further stated defendant and Tyrus Lewis spoke with police on June 26, 2024. Defendant and Lewis lived together, and defendant babysat S.Z. and three other children in their apartment. During this interview, neither defendant nor Lewis "provided information consistent with [S.Z.'s] cause of death." Detectives observed defendant and Lewis texting each other during their interviews. After their phones were seized, "messages from defendant to Lewis were found asking him to lie about being alone with [S.Z.] Lewis stated back he would not."

¶ 8 A follow up interview was conducted with defendant at the Pekin Police Department on July 18, 2024, and described in the affidavit as follows:

> "During the interview, defendant admitted she was overwhelmed on June 26, 2024[,] and angry with [S.Z.] after she would not stop crying. She explained to [Detective] Palmer she had attempted to get [S.Z.] to nap four times, but [S.Z.] was fighting sleep and extremely fussy. She admitted she was the only one in the room where she was attempting to get [S.Z.] to nap. Defendant admitted to pressing a 'lovey', a small security blanket with an attached stuffed animal, against [S.Z.'s] face until she stopped resisting. She detailed she had forced a pacifier into [S.Z.'s] mouth and held the 'lovey' over top. She told [Detective] Palmer that she may have been more forceful due to her frustration. Defendant stated she held the 'lovey' against [S.Z.'s] face until she closed her eyes."

¶ 9                                    B. Pretrial Detention Hearing

¶ 10          A pretrial detention hearing was held on July 23, 2024, before Associate Judge Derek Asbury, who presided over the hearing due to Judge Christopher Doscotch being called away for an emergency.

¶ 11                                    1. *The State's Proffer of Evidence*

¶ 12          The State proffered all the facts contained in the affidavit of probable cause and the pretrial services bond report to support its petition.

¶ 13          The State also proffered that Amanda Youmans, the pathologist who examined S.Z., determined S.Z.'s cause of death to be asphyxiation. Crime Scene Investigator (CSI) Erin Bowers processed the scene at defendant's apartment and found the "lovey" referred to in the probable cause affidavit. She testified, "It is almost a security blanket that has a stuffed animal attached to it, and inside of that lovey was a significant amount of vomit." The State explained "[t]here was also vomit found on the throat and chest of S.Z. when she was removed from the crib." CSI Bowers reported she found "an absence of any materials consistent with positional asphyxiation at the time she processed the scene."

¶ 14          The State submitted that Detective Allison Palmer of the Pekin Police Department conducted two interviews with defendant. During the first interview, on June 26, 2024, defendant and Lewis were interviewed separately but simultaneously, and through "live streaming of those interviews to other detectives[, they] were able to watch the conduct of both defendant and Tyrus Lewis in those interview rooms." Defendant and Lewis were observed texting on their cell phones. Their phones were seized, and an examination revealed messages sent by defendant to Lewis, described by the State as follows:

"messages sent by defendant to Tyrus Lewis specifically asking him to be dishonest with the police about what had happened in the home that day specifically asking him to tell police that he was alone with the deceased, S.Z., in the home and that he was the one who had last contact with her in the living room prior to being placed down for a nap on that day."

Defendant had deleted those messages in an attempt to conceal her actions, but the messages were recovered and confirmed through forensic extraction. The State proffered Detective Chris Beecher would testify that he performed those extractions.

¶ 15 The State proffered further, during the interview on July 18, 2024, defendant denied any accident had occurred or "any type of situation that would have caused accidental or positional asphyxiation." According to the State, defendant explained she attempted to put S.Z. down for a nap four times that day, but S.Z. was "fussy" and "inconsolable," and she became "frustrated, overwhelmed, and angry at the child." The State described defendant's explanation to the police as follows:

"She eventually admitted to holding a pacifier in the child's mouth and then when the crying continued around the pacifier using that lovey to be placed over her head and face and applying pressure to get her to stop crying. She described holding that position for at least a minute if not longer. She stated to police that she likely used more force because she was angry at the child during that time. She admitted that she held that lovey across her face until the movements of the child ended and her eyes closed

before returning downstairs. She went downstairs for approximately an hour and a half before returning upstairs and alerting anyone to the condition of S.Z."

¶ 16 The State expressed concern regarding the lack of involvement by the Illinois Department of Children and Family Services (DCFS). DCFS took no protective action against defendant or Lewis in the interest of their infant son. The State noted that a safety plan was put in place for "less than 20 hours before [being] removed before the conclusion of the autopsy or before the conclusion of interviews and investigation *** on both [by] the Pekin Police Department." DCFS's investigation ended "with no explanation and no consultation with the State's Attorney's Office including the Juvenile Abuse and Neglect Division nor the Pekin Police Department."

¶ 17 The State explained defendant's employment was "babysitting, daycare at her home, as well as at a school as a teacher's aide," and she had disclosed "some depression and anxiety and postpartum issues that she's working through as well." The State noted defendant admitted she was dishonest in the first interview, as well as the beginning of the second interview, because she was "scared and desperate to keep and see her own son," who was three months old and also in her care at the time of S.Z.'s death.

¶ 18 The State proffered that Tiffany Potter would testify that her two children were cared for by defendant and Potter's two-year-old child suffered an arm fracture while in defendant's care. When this occurred, defendant gave three separate explanations for the cause of the injury, including a ground level fall, contact with another child, and running into an object. The State indicated the "explanations given by defendant as to how those injuries were sustained

were not consistent with the injury[,] as [Potter] learned." Potter would testify defendant also told her the injury happened when defendant left the child unattended.

¶ 19    The State submitted that S.Z. suffered other injuries while in defendant's care, including a "linear pattern bruising to her arms, and that messages were sent including photographs of the injury." The photos of the injuries were admitted over defendant's objection.

¶ 20    Defendant moved for a directed finding at the close of the State's evidence. Defendant argued the State failed to offer evidence that there was no condition or combination of conditions that would sufficiently mitigate any danger defendant may pose. The motion was denied.

¶ 21    2. *Defendant's Evidence*

¶ 22    a. Testimony of Kim Atkins

¶ 23    Defendant presented the testimony of Kim Atkins, the pretrial officer for the Tazewell County Adult Probation Office who prepared the pretrial services bond report in this case. The report was admitted into evidence. Atkins testified defendant's criminal history consisted of a 2019 petty traffic offense, for which she received six months' supervision. Atkins also explained the risk assessment scoring tool used by her office, the Virginia Pretrial Risk Assessment Instrument-Revised, was not applicable in first degree murder cases. Therefore, there was no risk assessment score in this case.

¶ 24    b. Testimony of Defendant's Family Members

¶ 25    Brant Rhodes, defendant's brother, testified that he lived with his mother (Tara Summerson) in Peoria. His uncle (Trenton Summerson) and grandmother (Darla Summerson) lived there as well. He stated he was starting a job as a tow-truck driver that day and his work hours would vary from 8 to 16 hours a day. He had no criminal history. Brant testified that he

understood the responsibilities of being a third-party custodian for defendant, including being knowledgeable of her conditions of release and reporting any violations and he was willing and able to serve in that role. He acknowledged he signed an affidavit accepting the responsibilities of the role.

¶ 26 Macayla Rhodes, defendant's twin sister, testified. Like Brant, she stated she lived at her mother's house in Peoria. She was not employed. Macayla testified that she was willing to serve as a third-party custodian of defendant and would be available from 10:30 a.m. to 5 p.m. every day, as well as earlier if necessary. She acknowledged that she also signed an affidavit accepting the responsibilities of the role.

¶ 27 Tara Summerson, defendant's mother, also testified that she signed an affidavit and was willing to take on the responsibility of being a third-party custodian of defendant. She worked as a paraprofessional and would begin student teaching in the fall. She testified she was currently available to supervise defendant in the evenings and overnight (from 6 p.m. until 6:45 a.m.) and when her student teaching started in August, she would be available for similar hours (from 4 p.m. until 7:30 a.m.). Tara testified that she was willing to do this as long as required and defendant was welcome to stay in her home. When asked if she would "promise the Court to make sure that no children are permitted in your house if [defendant] is permitted to be there," she replied, "Yes." On cross-examination, Tara acknowledged that she had an "outburst" when she learned defendant was arrested and she had been very vocal regarding her strong belief in defendant's innocence. On redirect examination, Tara affirmed that despite her strong feelings, she would comply with her role as a third-party custodian and report any violation that came to her attention.

¶ 28       Trenton Summerson, defendant's uncle, testified that he would be available to serve as a third-party custodian for defendant. He acknowledged he had a criminal history, including convictions for forgery and domestic violence. He acknowledged his affidavit indicated he would be available from 4:30 p.m. to 6:30 p.m. Monday through Friday; however, he was not currently working, so he would be available "24/7." Trenton testified that he believed "[m]ore than 100 percent" in defendant's innocence, but he would still abide by the rules as a third-party custodian.

¶ 29       Defendant's attorney also proffered Darla Summerson, defendant's grandmother, would also serve as a third-party custodian and presented her affidavit agreeing to submit to the trial court's jurisdiction, as well.

¶ 30       c. The Video Recording of Defendant's Police Interview on July 18, 2024

¶ 31       Defendant submitted the video recording of defendant's second police interview, which occurred on July 18, 2024. The parties agreed the trial court would watch the entire interview, which was conducted by Detective Palmer.

¶ 32       The complete video is nearly 2 hours in length, which includes 15 minutes of an empty interview room at the beginning, two breaks where Detective Palmer leaves the room for approximately 7 minutes and 3 minutes, and another break where both defendant and Detective Palmer leave the room for 15 minutes. Portions of the interview were accurately described by the State during its proffer. The following is this court's summary of pertinent parts of the video interview.

¶ 33       At the beginning of the video, Detective Palmer and defendant walk into the room, speaking casually about motherhood and defendant's child. Detective Palmer explains the interview process to defendant, tells her she is not under arrest, and informs her of her *Miranda*

rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant agrees to speak with Detective Palmer and signs a written acknowledgement. Defendant talks about previously working for a school and her plans for returning to work, having recently been hired to a new position at a school beginning in the fall. She explains her plan for her twin sister to care for her son when she returns to work.

¶ 34 Defendant describes the morning of S.Z.'s death. S.Z. arrived at her home at around 7:30 a.m. and was given a bottle. Defendant offered S.Z. breakfast, which she did not eat. At around 9:55 a.m., defendant took S.Z. upstairs to "lay her down because she was super fussy." Defendant had been trying to calm S.Z. by trying to get her to play with her favorite toys and cuddling her, but defendant states, "[N]othing was calming her." Defendant says she normally lays S.Z. down when she is fussy and she goes to sleep, but this time she was "still kind of fussy." Defendant left S.Z. in the crib upstairs, but after about 10 minutes, she "went back up, checked on her, brought her back downstairs with [her] for a little bit," and she was "still super fussy." She recalled S.Z.'s mother said S.Z. would probably be tired because S.Z. woke up early, and she says she wondered at the time if S.Z. was just "fighting her sleep." Defendant states that at approximately 10:30 a.m., she "took [S.Z.] back upstairs, laid her down, she fussed for a little bit, gave her her pacifier and her lovey right next to her face like I always did and she fell right asleep." She described swaddling S.Z. and putting her in her sleep sack before putting her in the crib.

¶ 35 Defendant says S.Z. would usually cry for two or three minutes before going to sleep, but when she did not stop crying, defendant returned to the room again to calm her down. When asked what defendant did to get S.Z. to calm down this time, she says, "I literally just gave her the pacifier, and that was it." When asked if S.Z. immediately calmed down when defendant

gave her the pacifier, she says, "kind of, but still fussy, so then I just kind of left her." When she took S.Z. up for the second attempt, the other two boys she was babysitting were on the couch and her son was napping upstairs with Lewis. Defendant says Lewis may have seen S.Z. for two minutes in passing, but Lewis would never attend to S.Z.

¶ 36        Defendant explains that after the last time she left S.Z., she went downstairs and attended to her son, pumped her breastmilk, made a phone call to inquire about her Link card, and started making lunch. Defendant describes going back upstairs and seeing S.Z. lying on her stomach. Defendant rolled her over and realized she was not breathing. She states, "I immediately ran downstairs to [Lewis] because I was panicking very badly." She says she could not remember exactly where the lovey was because she was "panicking so bad," but it was still near S.Z. Lewis went upstairs and took S.Z. out of the bed while defendant was downstairs, "trying to get the other two to my sisters because I did not want them to—." She acknowledges she saw vomit "all down the front" of S.Z.'s sleep sack, but she did not notice vomit in S.Z.'s mouth. She explains, "I didn't really look. I literally just saw that she—normally when I roll her, she wakes up and she wasn't doing anything—like at all. So, I immediately like went into panic mode and ran downstairs, got [Lewis], and then he came up."

¶ 37        She met S.Z.'s mother through someone she knew while volunteering at a daycare. She shared a post on Facebook that she was looking to babysit over the summer, and S.Z.'s mother contacted her. When asked how much experience she had with infants, she says she had been around infants but had never really cared for infants on her own. She did not take any baby-care classes. She admits to not having any experience or training with infants and "kind of just learned as I was going."

- 11 -

¶ 38　　　　When asked about the texting that occurred during the first interviews, she states, "I was just panicking really bad." When asked what made her feel like she needed to instruct Lewis what to say, she replies, "I more so was scared that like—I don't know—that I would like get charged with like neglect or something—I don't know it just—and then with having [her son] anything right now was like freaking me out. So, I just, I don't know." When asked if she felt she did anything neglectful, she said, "No." When asked what was making her "freak out" she responds, "losing [her son]," and

> "that was one of my biggest fears about babysitting was something
>
> happening on my watch because I've always given 100 percent to
>
> any kid—and I loved [S.Z.] like she was my own and every day I
>
> would tell her mom that I just love her so much. So, it's just like a
>
> lot for me to take in."

When asked why she thought it was a possibility that she would lose her son, she replies, "Because it happened at the apartment," and "so I was just panicking like I said."

¶ 39　　　　Defendant says she did not know how any of this worked (referring to the investigation), and "that's the part that scared me the most was the fact that we had to come here because it made me feel like a criminal almost." She said that in a therapy session she had after it happened, she

> "kept saying like since it was on my watch it felt like it was all my
>
> fault like there was something that I could have done—and it felt
>
> like going out in public everybody hated me or everybody was
>
> judging like it just felt like that to me and I was telling my

counselor that and she was like that is totally normal like it's going

to happen for a while."

When asked if she felt like she did anything that contributed to what happened she says, "[N]o, I don't think so."

¶ 40 When asked about the injuries inside S.Z.'s lip and frenulum, defendant denies doing anything to cause those injuries. She says she would never try to force the pacifier.

¶ 41 While Detective Palmer states the medical records and experts all ruled out any medical or natural cause of death and S.Z.'s "death was caused by another person," defendant nods her head affirmatively. Detective Palmer states, "We don't just put down a ten month old for a nap and they just die." Defendant continues nodding her head. After continued discussion of the medical explanation for S.Z.'s death, Detective Palmer tells defendant she believes defendant wants to explain and is concerned about her own child, but she needs to tell her exactly what happened. Defendant replies, "Just the pacifier is it—that is the only thing that I applied pressure to." When asked to explain, defendant says, "She kept spitting it out and I just held it in there and was patting her butt—and then she started falling asleep which is normal so then I just let go of her and then left the room." Defendant says she would not do anything to harm a child. She denies pushing the "lovey" against S.Z.'s face and says she only applied pressure to the pacifier. Detective Palmer and defendant discuss that just holding the pacifier would not have obstructed S.Z.'s ability to breathe. Defendant describes holding her finger in the ring of the pacifier against S.Z.'s mouth and demonstrates the movement on her own mouth. Detective Palmer disputes this, saying that S.Z. "did not suffocate from somebody holding one finger worth of pressure against her mouth." Defendant says S.Z. cried for two minutes after she

walked out of the room. Detective Palmer tells defendant she is not being honest about that. Defendant suggests the blanket or the lovey caused S.Z. to suffocate after she left the room.

¶ 42　　　　The discussion shifts to both agreeing defendant would not have intentionally hurt S.Z., but Detective Palmer suggests defendant is not telling everything that happened and she needs to stop holding it in or hiding it. Defendant continues to deny doing anything other than holding the pacifier. Defendant says she told her everything, and Detective Palmer responds, "There is no explanation as to like why she died then. And I know that this was caused by a person." Defendant responds, "Yeah, but I never would have done that." Detective Palmer responds, "I'm not saying you would have done it intentionally, but I think you could have done it not knowing what you were doing." Defendant nods affirmatively. Detective Palmer asks if that is what happened, and defendant nods and says, "I think so."

¶ 43　　　　Detective Palmer says she did not think defendant went into the room to harm S.Z., and the following exchange takes place:

> "I think that you got overwhelmed [(defendant nods
> affirmatively)], and I think that honestly I think you ended up
> suffocating her on accident thinking like either holding her or
> holding something against her face [(defendant nods
> affirmatively)] but you held her in a way where she wasn't able to
> get good breath [(defendant nods affirmatively)] and I think that
> you ended up leaving the room thinking she had [(defendant nods
> affirmatively and interjects, 'just sleeping')] just gone to sleep—
> not realizing that you were walking away from her not responsive

[(defendant nods affirmatively)]. Is that like more accurate of what you think happened?"

Defendant replies, "Yeah." Detective Palmer then says the part she did not understand and that had not been explained is "that one factor that would have cut off her airway" and she believes defendant knows the reason. Defendant replies, "It was just the lovey," and she acknowledges she was "holding the lovey." Defendant says she did not think it was a lot of pressure. When asked if she was using the lovey to apply pressure to hold the pacifier in S.Z.'s mouth, defendant replies, "Yes." Defendant begins to cry and says she is "just scared." Detective Palmer says she did not think defendant left the room thinking anything bad had happened; defendant is crying and agrees, saying, "I didn't think it would." Defendant admits to being "overwhelmed."

¶ 44 Detective Palmer then restates the events of that morning and her interaction with defendant as follows:

"I think that you were overwhelmed and—overwhelmed, probably a little bit frustrated and angry [(defendant nods affirmatively)] because I mean you had been listening to her cry for hours now [(defendant nods affirmatively)]—this was like the third time you'd been trying to put her down for a nap [(defendant nods affirmatively)] you know, I think that you held the lovey like up to her face [(defendant nods affirmatively)] until she—what you thought went to sleep [(defendant nods affirmatively)] but it was really that was when she stopped breathing [(defendant nods and says, 'um')]. And I know—you know—I know that when you left the room, I know she didn't make more noise after that because

- 15 -

that wouldn't make sense [(defendant interjects, 'yeah')]. So, I just want to make sure that we are being [(defendant interjects, 'ok')] fully honest with each other now [defendant says, 'yeah')]."

Detective Palmer repeats that defendant held the lovey to S.Z.'s face with the pacifier in her mouth until "she stopped basically fighting it" and defendant thought she had fallen asleep, and "at that point she was probably completely unresponsive" and defendant left. Defendant, crying, nods affirmatively as Detective Palmer is speaking and says, "[Y]eah, but I didn't mean to."

¶ 45        Detective Palmer discusses S.Z.'s family needing to know the truth about what happened. When asked if she was responsible, when she went back into the nursery and found S.Z., she did not think it was from what she did. Defendant asks if she can leave the room to be with her family for a moment. Defendant and Detective Palmer leave the room. When they return, defendant is placed under arrest and taken into custody, and the video ends.

¶ 46                          d. Testimony of Defendant

¶ 47        Defendant testified that if released from custody, she would wear a GPS monitor and abide by the restrictions of home confinement at her mother's residence in Peoria. She also agreed to have no contact with any children. Defendant testified she had a three-month-old child she had been breastfeeding. While in jail, she had been expressing breastmilk for her mother to pick up to provide for her child. She understood that a condition of her release would include no contact with her own child. Defendant testified she would abide by all conditions placed on her if she were granted pretrial release. She stated she loved and respected all five family members who agreed to be third-party custodians and understood their obligation to turn her in if she violated any condition of pretrial release. On cross-examination, defendant was asked about her family believing in her innocence. When asked, "You're not innocent, are you?" she answered,

"No." On redirect examination, defendant clarified that she was confused when she answered that question, and when asked whether there was any "question in [her] mind as to whether or not [she] committed this offense," she answered, "No, sir."

¶ 48      3. *The Trial Court's Ruling on the Petition to Deny Pretrial Release*

¶ 49      After lengthy arguments by the parties, the trial court took the matter under advisement to allow it the opportunity to review the evidence, including the video recording of defendant's police interview. The parties agreed to this delay.

¶ 50      On July 25, 2024, the trial court issued its ruling on the petition for pretrial detention. After describing the "voluminous" evidence presented in this case, the court also described in detail its observation of the video recording of defendant's interview. The court then recited the applicable law regarding pretrial release in section 110-2(a) of the Code (725 ILCS 5/110-2(a) (West 2022)).

¶ 51      The trial court determined defendant was charged with murder, which is a qualifying offense under the Act, and the proof was evident and presumption great that defendant committed the offense. The court ruled further, "[W]ithout question, I think the Defendant poses a danger to any infant or young minor left in her care. We see that based on a ten-month-old asphyxiated when the Defendant was entrusted with the child's care." The court explained further the 10-month-old child was able to move and would struggle for breath, and there was evidence the child had vomited, which "would not go unnoticed by someone." The court "agree[d] with the State that the minor victim likely suffered prior to its death." The court further found the victim, being a young child, was "one of the most vulnerable members of the community" and there is no question that defendant posed a clear and convincing danger to her own infant son, explaining defendant "has ostensibly all those same conditions and stressors that

caused her to lose control and commit the alleged criminal act, and now in addition, faces a non-probationable murder case."

¶ 52    Regarding conditions to mitigate the danger, the trial court acknowledged defense counsel's contention that home confinement and GPS monitoring would be appropriate in this case because defendant testified she would comply with any and all conditions and had numerous affidavits of family members agreeing to monitor her. The court noted that the lack of "DCFS or social service involvement regarding the minor, the father, the mother or extended family" "weighs heavily into the Court's consideration." The court noted that GPS monitoring has its limitations and would not track information regarding who is in close proximity to defendant. Regarding the option of home confinement with constant supervision, the court explained:

> "Home confinement and 24 hour, 7 day a week supervision certainly is a different animal so to speak in regards to protecting the Defendant's minor child. It is—in conjunction with a no contact order if literally followed, would absolutely eliminate any risk.
>
> As to the custodial supervisors, I find that they testified at [the] hearing credibly. More specifically, the Court believes that they honestly believe that when they testified on Tuesday that they would enforce and report any violations.
>
> I thought about it a great deal, even challenged myself if I were in their shoes as a sister, parent, uncle, grandparent of the Defendant who to your knowledge and by all accounts has only

had a traffic ticket, whom you believe is innocent, that you may be required on a daily basis to not allow contact between a mother and her breastfed child, while the case is pending for six months, a year, two years, three years, knowing that she is facing a non-probationable murder charge.

All the parties were present during the hearing to hear the strength of the State's case except for the grandmother who wasn't present.

This means that you will knowingly have to prevent contact between the child and the mother who could go to prison for a long time and may not see or touch her child until her child is potentially of age to have her own child.

The temptation to violate is real and almost an impossible burden to expect of anyone. This impossible burden is compounded by the likelihood of visitation violations and that there is no evidence presented that the child is not placed with the father or some other family member of the Defendant.

The Court has no jurisdiction over these parties preventing contact from the child and the mother. If DCFS or any social agency was involved, this could be a different analysis.

First, professional oversight by trained, non-related, independent parties could structure supervised contact if

appropriate. This would then relieve the pressure of custodial supervisors and the Defendant and current caretakers." The court further found defendant's credibility as to her ability to comply with any conditions to be "mixed overall." The court described defendant's conduct and actions toward the victim as showing "impulsivity, lack of control, loss of sound judgment and rational thought. These are exactly the kind of actions where court orders are rendered almost useless as a deterrent or safeguard." The court explained if there was evidence presented by a mental health professional that "those conditions no longer exist or they're being treated or medicated and she does not present a risk, that would be entirely different evidence presented than what I've received." The court concluded that no pretrial conditions could mitigate the real and present threat to defendant's minor child at this time.

¶ 53　　　　　　　　　　C. Defendant's "Hybrid" Motion for Relief

¶ 54　　　　　　On July 29, 2024, defendant filed a motion for relief under the Act, seeking review of the trial court's decision to deny her pretrial release in two separate counts (mislabeled counts II and III instead of I and II). In count II, defendant contended a change in circumstances occurred, warranting reconsideration of the denial of her pretrial release. In count III, defendant contended the State failed to prove by clear and convincing evidence that no conditions could mitigate any real and present safety threat posed by defendant.

¶ 55　　　　　　In support of count II, defendant noted the "primary basis" on which the trial court denied her pretrial release was the fact that, at the time of the hearing, defendant could have had contact with her own child if released from custody. She argued that a change in circumstances had occurred, namely, the State filed a neglect petition against defendant on July 25, 2025. The following day, the State took temporary custody of defendant's child, prohibited

visitation between defendant and the child, permitted only supervised visitation between the father and the minor child, barred placement of the child with defendant's mother, sister, and anyone who resided with them, and barred placement of the child with anyone "who had contact with [defendant] while she was in jail and in the presence of the minor." Because her child was now in protective custody and placement with defendant's family members is barred, defendant argued she no longer posed a real and present threat to the safety of any person or persons or the community that cannot be mitigated by conditions of release.

¶ 56    In support of count III, defendant argued the State failed to meet its burden of proving no condition or combination of conditions could mitigate any real and present threat she posed. In support, defendant stated, *inter alia*, she had no criminal history other than a traffic offense, had no history of drug or alcohol use, had strong family ties to the community, and had numerous family members willing to provide supervision if she were released to home confinement and would abide by any condition made a requirement of her release, including no contact with any minor and her own infant son.

¶ 57                              1. *Hearing on Defendant's Motion*

¶ 58    A hearing was held on August 2, 2024, with Judge Doscotch presiding. Extensive discussion took place regarding the fact that a different judge presided over the original hearing in this matter.

¶ 59    Defense counsel proffered new evidence, namely, the details of the neglect case, wherein defendant's child was placed in the care and custody of DCFS, defendant was ordered to have no contact with the child, the child's father was granted supervised visitation, and placement with defendant's family was not allowed.

¶ 60        Tara was called to testify. She stated she scheduled an appointment for defendant with "Dr. Petit from Carle Health" shortly after the incident because she "knew [defendant] would probably be having anxiety and stuff so we took her in" and the doctor "put her on medicine." Defendant had a follow up appointment scheduled the next week, and Tara was prepared to take defendant to the appointment and bring her directly home.

¶ 61        The State moved to strike this testimony, objecting because it was not included as new evidence in the written motion and the information was, in fact, available to the defense at the time of the original hearing. Another lengthy discussion, including the trial court's concern about raising a claim of new evidence under the Act at every court appearance, potentially leading to "doing rehearings with things every week, new evidence on whether you're in or out, and that can't be the point of this either because it wouldn't work." The court stated it was inclined to allow the evidence but decided to take the matter under advisement. The court also noted, "[I]t's not like I have a doctor up here right now telling me something," and, "I don't even know what the doctor is. She can't testify to medical things obviously. She's just saying [defendant] has an appointment. How much weight am I gonna put on that anyway to be honest with you without having any specifics? I don't know."

¶ 62        The State asked the trial court to take judicial notice of Tazewell County juvenile court case No. 24-JA-141, specifically noting that the case was not opened by the filing of a petition by DCFS. Instead, the state's attorney "urged DCFS to take action and involvement which they did not do"; therefore, this juvenile case was "a direct file by the State's Attorney's office after no action was taken by DCFS within that 48 hours." The State noted, "[D]espite the fact that certain family members have been excluded from having custody and contact [with defendant's child], it is still a family placement." The State acknowledged it did not know what

family member had custody of the child, but because it is a family placement, it argued Judge Asbury's concerns were not alleviated. When asked for further explanation about the restrictions on family members' contact with defendant's child in the juvenile case, the State replied, "[I]t's anybody who had contact with [defendant] with the child because of the video visits [(while defendant was in jail),] they were putting the baby in front of the camera."

¶ 63                    2. *The Trial Court's Ruling on the Motion*

¶ 64         At the close of the hearing, the trial court took the matter under advisement, and it issued its ruling on August 8, 2024. The court found the proof evident and presumption great that defendant had committed the qualifying offense as charged. The court also found defendant presented a real and present threat to her own child and others, noting the statement from Potter regarding the bruising on her child while in defendant's care. The court also had a "visceral reaction" to the video of defendant's interview, where she talked about continuing to provide daycare services after this incident and her plans to do so in the next school year. The court stated, after reviewing all the evidence, it was "even the more concerning regarding a real and present threat" of safety to the community.

¶ 65         In addressing whether there could be any condition or combination of conditions to mitigate the real and present threat defendant posed, the trial court enumerated the factors set forth in section 110-5(a) of the Code (725 ILCS 5/110-5(a) (West 2022)) and expressly stated it viewed all the evidence and considered all the relevant factors. After describing the evidence presented at the hearing in detail, the court found the weight of the evidence against defendant to be a significant factor. The court found defendant's behavior during both police interviews, via its observations of the video of the second interview and the statement detailing the texting that occurred during the first interview, reflected poorly as to defendant's credibility and character.

The court expressed concern that any mental health issues as noted in the pretrial services bond report could affect defendant's desire to reunite with her child and "cloud [her] judgment, the same as [her] judgment to continue caring for children after this incident," as revealed in her video interview.

¶ 66　　　　　The trial court noted defendant's strong bond with her family and also expressed concerns about trusting Lewis, who had supervised visitation with the child, and other family members to honor the order that defendant have no contact with her child (referring to defendant viewing and interacting with the child during video visits). The court noted defendant's work history was "almost exclusively" in childcare. The court reviewed the nature and circumstances of the child's death and stated defendant may have "[w]orried more about [herself] than that child or other children."

¶ 67　　　　　The trial court acknowledged the family's willingness to share in the obligation of being third-party custodians if defendant were released on home confinement and that it would be a "huge undertaking" for a long period of time.

¶ 68　　　　　Addressing the two counts of the motion, the trial court ruled as follows:

> "Obviously, you can tell that I'm going to affirm [Judge]
> Asbury's first ruling and then I will deny the *** not
> reconsideration but the new evidence for release based upon the
> factors that were put in [count II] of the motion for relief which is
> new for the reasons I just stated on the record in addressing the
> new change in circumstances. I've obviously addressed the
> concerns in the first hearing as well as it came closer to releasing
> you with these new facts than it did at the original hearing."

¶ 69        D. Defendant's Second Motion for Relief Under the Act

¶ 70        On September 3, 2024, defendant filed a second motion for relief under the Act, seeking review of the trial court's determination that, regardless of the change in circumstances, no condition or combination of conditions could mitigate the real and present threat posed by defendant. Defendant argued the threat to her child was alleviated because of the juvenile case, wherein DCFS took temporary care and custody of her minor child, defendant was denied visitation, placement with certain family members was barred, and Lewis was granted supervised visitation with the child.

¶ 71        A hearing was held on September 3, 2024, before Judge Doscotch. The trial court denied the motion, deciding to "stand on its previous ruling." The court explained, "[I]t went through all the factors. Mainly I think it's A through G or A through F of the [Code (725 ILCS 5/110-6.1(a) to (g) (West 2022))] in regards to determining pretrial release."

¶ 72        The trial court consolidated both motions for appeal. Defendant filed her notice of appeal on September 9, 2024, listing the court's orders entered on August 8, 2024, and September 3, 2024.

¶ 73                    II. ANALYSIS

¶ 74            A. Good Cause Shown for the Timing of the Decision

¶ 75        We must first address that pursuant to Illinois Supreme Court Rule 604(h)(8) (eff. Apr. 15, 2024), our decision in this case was due on or before December 18, 2024, absent a finding of good cause for extending the deadline. This court granted defendant's motion for an extension of time to file the record and two additional motions for extensions of time to file her memorandum in support, all relating to defendant's efforts to ensure certain evidence admitted at the detention hearing was included in the record, namely, the video recording of defendant's

police interview. As a result, defendant's memorandum was not filed with this court until December 4, 2024, with the State's memorandum following on December 23, 2024. Under the circumstances, we find there to be good cause for extending the deadline.

¶ 76　　　　　　B. The Trial Court's Denial of Defendant's Pretrial Release

¶ 77　　　　　　Section 110-2(a) of the Code provides that all criminal defendants are presumed eligible for pretrial release, subject to certain conditions. 725 ILCS 5/110-2(a) (West 2022). The Code provides, in pertinent part, the State may petition for pretrial detention if (1) a defendant is charged with a detainable offense as enumerated in the Code, (2) the defendant's release would pose "a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case," and (3) "no condition or combination of conditions" can mitigate the threat. *Id.* § 110-6.1(d), (e)(1)-(3). The State has the burden of proving by clear and convincing evidence that any condition of pretrial release is necessary. *Id.* § 110-2(b). We review a trial court's findings regarding pretrial release for an abuse of discretion. *People v. Morgan*, 2024 IL App (4th) 240103, ¶ 35; *People v. Inman*, 2023 IL App (4th) 230864, ¶¶ 10-11. An abuse of discretion occurs when the trial court's decision is "arbitrary, fanciful, or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court." *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 78　　　　　　Defendant does not challenge the trial court's determination that she was charged with a detainable offense and posed a threat to the safety of any person or persons or the community. Defendant's only challenge to the court's decision to deny her pretrial release is the finding that the State proved by clear and convincing evidence that no conditions could mitigate the threat she posed. In this regard, defendant's challenge is twofold: (1) the evidence presented at the original detention hearing showed home confinement and an order prohibiting contact with

any children would eliminate any risk she posed and (2) a change in circumstances occurred, alleviating any concerns that she posed a threat to her child when the juvenile court case resulted in her son being placed in the custody of DCFS, the child's placement with certain family members of defendant being barred, defendant being denied visitation, and Lewis being granted supervised visitation.

¶ 79                                    1. *The Original Detention Order*

¶ 80          Defendant argues the evidence presented showed home confinement with around-the-clock supervision by her family members, who were willing to serve as third-party custodians, and an order prohibiting any contact with children would eliminate any risk defendant posed in this case. She argues the trial court recognized such a circumstance would "eliminate all risk"; thus, the decision to deny her pretrial release was erroneous.

¶ 81          A finding of dangerousness alone does not automatically warrant pretrial detention. *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18 (finding pretrial detention requires more than being charged with a detainable offense or posing a threat to public safety). "Instead, the trial court must determine, based on the specific facts of the case and the defendant's individual background and characteristics, whether any combination of conditions can mitigate the threat and allow the defendant's release." *Id.* Trial courts must also consider the "nature and circumstances" of the charged offense and "the weight of the evidence." 725 ILCS 5/110-5(a)(1), (2) (West 2022). "In each case, a court must conduct an 'individualized' assessment of the propriety of detaining the defendant versus releasing him or her with conditions." *Atterberry*, 2023 IL App (4th) 231028, ¶ 15. If the trial court decides to deny pretrial release, the detention order must include findings "summarizing the court's reasons for concluding that the defendant should be denied pretrial release, including why less restrictive

conditions would not avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case." 725 ILCS 5/110-6.1(h)(1) (West 2022).

¶ 82        After our vigilant review, we determine the trial court's original decision to deny defendant's pretrial release in this case was not an abuse of discretion. The nature and circumstances of this alleged offense represent one of the worst kinds of betrayal of trust. Likewise, the weight of the evidence against defendant is significant. Defendant was entrusted with the care of a 10-month-old child, and by her own admission, she was overwhelmed and frustrated because S.Z. was fussy and inconsolable on the morning of the incident. Defendant admitted during her interview that she held the lovey to S.Z.'s face with the pacifier in her mouth until, as Detective Palmer described, "[S.Z.] stopped basically fighting it" and "was probably completely unresponsive." Although defendant said she "didn't mean to," S.Z. died as a result. The pathologist identified injuries to S.Z.'s mouth and frenulum and determined her cause of death to be asphyxiation. Evidence was presented that this was not the first time a child in defendant's care was injured, as Potter testified that her two-year-old child suffered an arm fracture while in defendant's care and was given three separate explanations for the cause, none of which were consistent with the actual injury. The record reveals defendant's employment had been as a daycare provider, she continued to provide those services after the incident, and she had plans to begin working at a school again in the fall. Defendant, herself, had an infant child. At the time of the original detention hearing, DCFS had taken no action to ensure the safety of defendant's child.

¶ 83        The trial court acknowledged defendant's lack of criminal history, lack of drug and alcohol use, and close relationship with her family. The court found defendant's family

members who testified as to their willingness to serve as third-party custodians to be credible, but the court also noted it would require them to "knowingly have to prevent contact between the child and the mother who could go to prison for a long time and may not see or touch her child until her child is potentially of age to have her own child." The court explained further:

> "The temptation to violate is real and almost an impossible burden to expect of anyone. This impossible burden is compounded by the likelihood of visitation violations and that there is no evidence presented that the child is not placed with the father or some other family member of the Defendant."

Under the circumstances, we cannot say that no reasonable person would agree with the trial court's position. We further find it was neither arbitrary nor unreasonable for the trial court to determine that home confinement or any other condition or combination of conditions of release would be insufficient to protect the safety of defendant's child under the circumstances. Therefore, we affirm this decision of the trial court.

¶ 84                                    2. *Change in Circumstances*

¶ 85        Defendant argues that a change in circumstances occurred after the initial detention hearing when the juvenile court case was filed, which then prohibited defendant from having any contact with her son. As such, she argues, "the trial court's initial concerns regarding the effectiveness of conditions were alleviated," and this court should reverse the detention order and remand defendant's case with instructions to order her release with appropriate conditions. We disagree.

¶ 86        When a defendant is detained at the initial detention hearing, the Code requires as follows:

- 29 -

"At each subsequent appearance of the defendant before the court, the judge must find that continued detention is necessary to avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or to prevent the defendant's willful flight from prosecution." *Id.* § 110-6.1(i-5).

This court has determined that a showing of "new information or a change in circumstance" is required for relief under this provision of the Code, reasoning, "If a court has found that a defendant qualifies for detention and no new information or change in circumstances is presented, it makes little sense to think that court would reverse its prior ruling for no particular reason." *People v. Walton*, 2024 IL App (4th) 240541, ¶¶ 28-29.

¶ 87　　　　The trial court acknowledged, and we agree, that a change in circumstances did occur in this case after the initial detention decision was made. Prior to the original hearing, no action had been taken by DCFS regarding defendant's infant son. It was not until the state's attorney's office took action that the juvenile court case was opened. According to the temporary custody order in that case, custody of defendant's son was given to DCFS, with the authority to place the child, defendant was denied visitation, and Lewis was granted supervised visitation. The order further provided:

"The Court finds that placement with Tara Summerson, *** Macayla Rhodes, *** any individual who resides with Tara Summerson and Macayla Rhodes, and any individual who had contact with the mother while she was in jail and in the presence of the minor is not appropriate and placement shall be barred."

¶ 88 Defendant's argument that the trial court, itself, recognized that home confinement and an order prohibiting contact with children would "absolutely eliminate any risk" is a mischaracterization of the court's reasoning. The court specifically stated that home confinement "in conjunction with a no contact order *if literally followed*, would absolutely eliminate any risk." (Emphasis added). The court found the risk that such an order would *not* be "literally followed" might be "too great" and "that potential risk would be too much" in this case. This determination is supported by the record. As the court noted, defendant's behavior during both police interviews reflected poorly on her character and credibility. Defendant's conduct during the first police interview revealed her willingness to ask Lewis, the father of her child, to lie for her in text messages. She then deleted those messages from her phone in an attempt to cover up her conduct. Defendant admitted she did so out of fear of losing her child. Defendant's conduct during the second interview is similarly concerning, in that she repeatedly said she was most concerned with losing her child when discussing what happened to S.Z. The court's conclusion that defendant may have "[w]orried more about [herself] than that child and other children" is supported by the record.

¶ 89 Furthermore, there was evidence that family members had been allowing contact between defendant and the child during video visits at the jail. During a video visit with defendant while she was in jail, Lewis had their child with him and allowed defendant to interact with the child. The record suggests that other family members did the same thing. The temporary custody order expressly barred placement of defendant's son with Tara, Macayla, and anyone who lived with them, along with any other person who had contact with defendant, with the child present, while defendant was in jail.

¶ 90          Most concerning is that the record is unclear as to who now has custody of defendant's child, where he resides, and with whom he resides. The family members who testified at the original hearing all stated they resided in the same home with Tara. During a discussion of the current whereabouts of the child, the State indicated, "[D]espite the fact that certain family members have been excluded from having custody and contact, it is still a family placement. I do not know what family member. I cannot get communication from DCFS about this case after how it began with their agency." Defense counsel provided no clarification in this regard. Given the evidence, including defendant's conduct and the closeness of this family, where it was shown that multiple generations are living together, the trial court's concern regarding the "likelihood of visitation violations" was warranted.

¶ 91          We conclude the trial court did not abuse its discretion in concluding the provisions of the temporary custody order in the juvenile case would not alleviate the risk posed by defendant. It is apparent from the record defendant has a close connection with her family members and they have great sympathy and support for her. The record also shows defendant's willingness to ask a loved one to lie for her out of desperation to maintain contact with her child, which, based on her police interview, is her paramount concern. The record supports the trial court's conclusion that, under the specific articulable facts in this case, the risk to the child's safety would remain even if defendant were on home confinement under the supervision of her closest family members, who steadfastly believe in her innocence, with her child being placed with an unidentified family member at an unidentified location.

¶ 92          Finally, defendant argues the new evidence presented regarding her mental health treatment warranted the reconsideration of the denial of her pretrial release. However, the record contradicts defendant's argument that the trial court "overlooked that the pretrial bond report

presented at the initial detention hearing established [defendant] was receiving mental-health treatment, including medication." In fact, Judge Asbury stated that he reviewed the pretrial services bond report, which indicated defendant had seen Dr. Petit for postpartum "anxiety and depression." When issuing his ruling, he stated, "[T]he evidence shows that [defendant] may have been suffering from some sort of postpartum or other issue." Although the report indicated defendant had been prescribed medication and had been referred for treatment, the court found that defendant failed to present evidence from a mental health professional or other evidence regarding psychological examinations, diagnoses, or treatment. We do not find these contradictory. Regardless, Tara's testimony did not present any evidence that was not previously in the record. Tara testified that she took defendant to see Dr. Petit after S.Z.'s death, he "put [defendant] on medicine," and defendant had a follow up appointment pending. These facts are stated in the pretrial services bond report, which was submitted during the original hearing.

¶ 93        In sum, we conclude the trial court did not abuse its discretion in finding that, despite any change in circumstances resulting from the opening of the juvenile court case involving defendant's child, there exists no condition or combination of conditions that would mitigate the real and present threat defendant posed in this case.

¶ 94                                III. CONCLUSION

¶ 95        For the reasons stated, we affirm the trial court's judgment.

¶ 96        Affirmed.